Good morning, Your Honors. I'm Susan Hutchison, and I represent Erony Pratt on behalf of her son that died while being taken into custody by sheriffs with the Harris County Sheriff's Office. In this case... Can I ask you something about the facts? Because it's a little... Everybody's analyzing this as kind of an arrestee Fourth Amendment case. What was he arrested for? I mean, I don't understand there to have been any crime, per se. He's walking around acting kind of nutty. What was he arrested for, and at what point did the arrest begin? Well, that is an excellent question. There was no crime that they could identify that he committed. And their position has been that it was more of a taking him into custody to prevent him from harming himself or others because of his erratic behavior. But they did not identify any particular crime that he had committed at the time. Did that change the analysis at all? I don't believe it changes the analysis, the excessive force analysis. There were a number of deputies that arrived at the scene. The first deputy that arrived noticed that he was acting erratically and made the decision that they needed to take him into custody to prevent him from running into the street or getting hurt or hurting someone else. So during that time, a couple of other deputies arrived, and they began to taser him. One of the deputies' tasers connected. The other ones didn't. And at that time, he went down, and he was handcuffed and taken into custody. More deputies arrived. Two of the deputies stood him up and were walking him along. There is a lot of conflict in the testimony of the deputies as to what happened. And I think it calls their testimony, their credibility into question substantially. Deputy Wilkes, the one who eventually applied the hog tie, says that when he arrived, he saw them walking Mr. Pratt along and that he was swinging wildly his arms and kicking his legs until he was confronted with the fact that Mr. Pratt was handcuffed and could not have been swinging his arms and that he was walking and wasn't kicking. And then he conceded, yes, he wasn't doing that. So their testimony about his conduct and whether he was resisting and how much does not have a lot of credibility with it. Despite that fact, they contend that he began to pull away again. They took him to the ground again. There were six deputies at that time restraining him. They tased him five more times with both the wires and in the drive-stun mode. And then Deputy Wilkes made the decision to go and get his hobble from the car and apply the hobble. There is conflict in the testimony about whether he was hog tied. However, one of the deputies did acknowledge that he was hog tied, even though he later recanted, and the paramedic that arrived on the scene said that he found him on his stomach, restrained, hog tied, and unresponsive. And then he defined what hog tied meant. And he said there was no question in his mind that he was hog tied when he arrived. How does the hog tying contribute to death? I mean, what is the tie in there? It restricts the ability to breathe because the limbs are all behind and tied together. And so the individual who, it's a combination of terrible things, an individual being on his stomach with all the limbs being restrained, being tased with two of the deputies on his back, and they left him laying in that manner after he was noted to be unresponsive until the paramedics arrived and did nothing to turn him on his side, provide him any assistance, or do anything to attempt to assist him. So there was a policy at the Sheriff's Department that prohibited hog tying. And while we acknowledge that the violation of a policy does not in and of itself establish a constitutional violation, all of the deputies acknowledged that they understood that hog tying was generally considered to be excessive and could be a constitutional violation under circumstances like these. The district court said, well, in this case, these deputies didn't know that he was under the influence of drugs, so we're not going to attribute that knowledge to them, taking it out of the Gutierrez realm. But the deputies, all of them acknowledged that they believed he was on drugs or having some kind of mental crisis because he was running around just like in Gutierrez. He was disrobing, he was acting erratic, he was not responsive to commands, and indeed escalated his erratic behavior the more the commands were given to him. So all of the deputies acknowledged all of the Gutierrez factors, which would make this an established violation of a constitutional right. Gutierrez has been around forever. Not only that, but there was a lawsuit against Harris County in 2007 for very similar circumstances where an individual, where a jury found that the individual died as a result of being hog tied and tasered with positional asphyxia. So why would this need to be a single incident analysis if there's already been a prior incident? The idea of the single incident is you kind of knew it would have come even though you had no prior warning. You're arguing that they had a prior warning, so why would we analyze it that way? I think it could be, I think if the court said, well, a prior incident is not enough to establish a pattern to fall under Monell, it could at least be determined that it was a single incident because they had knowledge of the possibility and the drastic results of it, you know, that this was going. Are you talking about Monell holding the city liable? I thought their policy was that they didn't allow hog tying. Correct. However, that policy was not, they didn't train them about it. The sheriff didn't even know. If you have a failure to train instead of, what do you have? Yes, sir, under the failure to train, and I think that the failure to train cause of action is one that encompasses both the prior knowledge and the single incident exception because I think that under the city of Canton, the city of Canton holds that the policy can be inferred even without a pattern, so long as the need for action is so obvious that the failure to act rises to deliberate indifference, and I think it's incredibly obvious that if you don't train your deputies. How is it deliberate indifference if they have a policy that specifically prohibits the conduct that you're complaining about? Yes, sir, but none of the deputies were trained. How do you train them not to do a hog tie? Well, you train them, Your Honor, there are many ways that you could train them in that regard, and one of them is to train them on the ramifications. A good hog tie and a bad hog tie. Yes, sir, their policy prohibited all hog tying. Well, they could be trained on how to handle a person who's having mental disturbances short of hog tying. Is that a possibility? Was there evidence about that kind of training that should have been given, or what evidence do we have about that? Yes, Your Honor. The person that was produced by the county in the 30B-6 with respect to the training issues stated that they didn't even address hog tying at all or that type of restraint. They didn't address positional asphyxia, the dangers of leaving someone on their stomach, the problems with hog tying, alternative manners of restraint, or how to appropriately use a hobble, any of those things in training. They didn't even address them. They just said they just had a policy that said don't hog tie and never explained to any of them why or how the dangers associated with it could be avoided. Who specifically are you claiming was involved in the actual hog tying, actually doing it? Deputy Wilkes was the one who actually applied the hog tie restraint. Deputy Goldstein was the one that was holding his legs and assisting in the application of the restraint. What do you do about the autopsy that indicated that his death resulted from multiple factors and not simply from the excesses of the police? Indeed, Your Honor, our own expert said that there were various things that contributed. But the law says, as I understand it, you're bound by the law that says the injury has to result only from the excessive force. Your Honor, I don't believe that that is the law. The district court cited that and cited some Fifth Circuit cases, and if you follow those Fifth Circuit cases back, that is not the law. It goes back to a case that, in fact, says that it does not follow the solely and only cause. And if you look at the Fifth Circuit pattern jury instructions, they present it as cause in fact, that you have to prove that it was a cause in fact, that if it appears from the evidence that the act or omission played a substantial part in causing the injury. And that is very different than solely and only. And, in fact— Where do we get that? Where does that mistake originate? Your Honor, I think it originated in the Harper case where it was distinguishing— the Harper case was a Fourth Amendment excessive force case. And in that case, the defendant had argued that the solely and only language. And in that case, the court said, no, we're not requiring— first of all, they were saying we're not going to require a significant injury in order to have a constitutional violation. So you don't even have to have a significant injury. But they distinguished the case relied upon by the defendant there and said—and rejected it. And I don't know, frankly, how that resulted in other cases citing to that case for the solely and only language. Is that—since we adopted that, has that been the test or has any of our cases gone back to a substantial injury? There are a number of cases that have—the Harper case was cited by two other Fifth Circuit cases. And those cases were cited by a number of subsequent cases for the solely and only language. So as we would read the law now, it's solely and only. No, it's directly and only. Directly and only. Directly and only. Sorry. Directly and only. Directly and only is the standard. But you defend that that is incorrect because it overrules previous established precedent that was prior to the precedent of directly and only. Yes, sir. I think it was a standard that was cited in error and then subsequently followed by other cases. But I think if you go back to the basis for it, it doesn't exist.  Let me just ask this. Was—has there been a Fifth Circuit case that turned on the word only? In other words, it was clearly excessive force, clearly caused harm, but there was also another contributing factor to the harm and, therefore, the defendants were let off. Is there any such case? Because I couldn't find it. I am not aware of one that exists. So we don't really know what this word only means in the context of—I mean, we know what typically the word only means, and I understand that. But in the context of this whole excessive force rule with this directly and only, we don't know that it means to say if you have a guy that's on drugs, it's open season. You can kill him, and that's great because the drugs can always be a contributing cause of the death, too. We don't know if that's what the Court meant in the original formulation of that. Probably not. Right. I don't know that that—that is how—it's my understanding that's how the district court in this case interpreted it. And that's how it's being argued, and I find it very concerning because it seemed to be open season on drug-addled people that are wandering around screaming can just now be killed at will because we can't say only this other thing caused the death. A bit of an overstatement, but— Well, and let's say, for example, someone was an asthmatic, and their asthma contributed to their asphyxia when they were handled in this manner. Would you then be able to extend that to that case and say, well, their asthma also, their inability to breathe also contributed to the fact that they asphyxiated, therefore they can't be held responsible for the excessive force? So I think if you take that out, extend it to its logical conclusion, there are many difficulties with the application of that kind of a standard in this kind of a case. I agree with you on that. I mean, it is problematic. But, I mean, it slipped into the law, and it must not have been problematic to other judges. I don't know. Is it dicta if it's never been applied in any sort of capacity where the only standard somehow provided a limitation? I think that that is a reasonable argument to make, that it is, because it hasn't been used in this manner in any case that I could find to assess the reasonableness of the use of force. But then it has to have some meaning. I mean, that's the problem. You get to a case like this one where there were multiple causes of—it could have been causes of this man's death. We don't know what they were, but there were multiple. And we don't know whether the hogtie was 1%, 50%, 20%. All we know is he died. He was a very sick man with a lot of illnesses. And he was hogtied, and he died. And that's about all we know. Was he a very sick man with a lot of illnesses? Well, he had— I thought it was the drug issue. I believe that the autopsy, that the medical examiner attributed it to both the asphyxiation and the drugs and said, I can't give you one or the other. Our expert, also a medical examiner, said, I can tell you that the drugs contributed. He was in an excited delirium state. But that but for the manner in which he was restrained and the positional asphyxia, he would not have died. But but for the ingestion of the drugs, did he have some other condition? Like you mentioned asthma is a hypo. Were there other conditions like that? The autopsy noted some heart issues, but not as a cause of— The student was obese, had a history of chronic drug use, and showed evidence of cardiac pathology, dilated and hypertrophic cardiomyopathy with microscopic fibrosis. So he was— How many people does that describe? Yes. Not a super healthy man. But in terms of the causation issues, both of the medical examiners related those to the drugs and the asphyxiation. And the fact that he's obese and generally in poor health wasn't going to be imminently deadly for him. Correct. Is the point. Okay. And would the drugs by themselves likely have killed him? Had he been allowed to wander around and kind of pass out in the ditch and wake up, would he have woken up? According to our medical examiner, yes, that the drugs by themselves would not have killed him. He would not have died when he did in the manner that he did. Thank you. Okay. Thank you very much. We will now hear from Ms. Baker, representing Harris County. Good morning. May it please the Court, I'm Mary Baker, senior assistant county attorney, and I represent the appellees who are five individual officers who used force, four officers sued individually who are alleged to have failed to protect, and three supervisors in Harris County. So a total of 13 appellees. I would like to begin by clearing up several things that the appellant has just argued, and in particular to answer the question that you had, Judge Haynes, what was Mr. Pratt arrested for? The record, and unfortunately I do not have a record site for you, but it is in the record that Mr. Pratt was arrested for, or they were attempting, the deputies were attempting to take him into custody on a charge of failure to stop and give information, which is a misdemeanor violation under the Texas Transportation Code. And the reason that Mr. Pratt even came to their attention was that Mr. Pratt had run into another motorist and had left the scene without giving his information. So that particular motorist called 911 after Mr. Pratt departed from the scene. Mr. Pratt actually drove his car into a ditch when Deputy Lopez, who is one of the individual defendants, first arrived. He observed Mr. Pratt's car in a ditch, and he observed that the airbags had deployed. There was front-end damage to Mr. Pratt's vehicle. Mr. Pratt was out of the vehicle, but he actually had left the driver's side door open. There is also testimony in the record that there were two other 911 calls from neighbors who had observed Mr. Pratt out of his vehicle. There is testimony in the record from a neighbor, Mr. Stephen Garner, that Mr. Pratt had actually left his car in gear, and Mr. Garner had actually turned the vehicle off. But that was not occurring when Deputy Lopez got there. I have several other things that are so important, but let me run through the facts. To take your statement about he was arrested for failure to stop and give information, doesn't the severity of the crime weigh into the excessiveness of the force analysis? If he's being arrested for blowing up a building or something, then that would justify a greater degree of force than if he's being arrested for failing to stop and give his ID. Well, actually, it's failure to stop and give his ID. That's correct. And Your Honor is quite correct that that is one of the gram factors, the severity of the crime at issue. And, of course, the other ones are whether Mr. Pratt posed a danger to himself or to someone else, and whether or not he was attempting to flee. So the record in this case shows that when Deputy Lopez, who was ditched – all these deputies were dispatched by Harris County from the 911 to the scene of the incident. And Deputy Lopez was the first to arrive. When Deputy Lopez arrived, he did observe Mr. Pratt, you know, kind of running around. He had taken his shirt off. He had his fist in the air. But the evidence in the record shows that Mr. Pratt approached Deputy Lopez in a very, very aggressive manner. He squared off against him. He had his fist clenched like a boxer. And it was to such a degree that Deputy Lopez unholstered his taser in the event that he should need it. The evidence also – What training has Harris County given their deputies in dealing with somebody who is mentally disturbed, whether by drugs or by a mental illness or something like that? Because Harris County is a big place, and there's a lot of people there, and not all of them conduct themselves with perfect decorum. And so what training have they had on dealing with someone who's in an agitated state for whatever reason? I'm sure that doesn't go just to Harris County, that not all people conduct themselves in proper decorum. But to answer your question, Your Honor, each and every one of these deputies was trained according to state-mandated standards. And the state-mandated standards include a segment in the basic peace officer class on handling abnormal persons. And there is also a required training, the critical incident CIT training, which deals also – it's an addition to the state-mandated training. In fact, I think it may also be mandated, which would teach a deputy how to approach such a situation. And did they follow that training here? Well, you know, Your Honor, that training mainly comes into play when the deputies are aware that this may be an abnormal person. And deputies – let me back up to the 9-1-1. If the court reviews the 9-1-1 tapes, you will see that the 9-1-1 – and transcripts – you will see that the 9-1-1 dispatcher asked, are there any mental health issues? And the reportees, the people who made the 9-1-1 calls, said none that we know of. And the dispatch also asked, is EMS needed? And the response was no. So this information would not be provided to the deputies because it was not available. There was no saying – The court said he was wandering around. Yeah, he was wandering around. And Deputy Lopez uses the word acting erratically. And Deputy Lopez's testimony was quite clear that he thought Mr. Pratt was intoxicated, which he was, because on autopsy he also had ethanol in his system. And so he was acting erratically. He was intoxicated. So did he follow the training applicable to dealing with an intoxicated, erratic person? I would say generally yes, but the person who followed it perhaps a little more closely in terms of trying to use the calming techniques was Deputy Goldstein. And Deputy Goldstein was either the second or third deputy to arrive, and the evidence in the record shows that Deputy Goldstein kind of walked along – well, actually they followed along behind Mr. Pratt as he was walking away from the deputies despite being ordered by them to stop. But Deputy Goldstein's approach was quite similar to the CIT training approach because he asked Mr. Pratt, hey man, what's going on? Is everything okay with you? And got basically no response. So the deputies were really obligated to, at a minimum, detain Mr. Pratt on this charge of failure to stop and give information. Well, we understand he didn't blow up a bank. It is a violation of the Texas Transportation Code, and it was something about which 911 had received phone calls. Let me ask you this. Yes. In terms of the direct and only, I mean we went through the high post with your opponent, and I've been sort of accused of taking it too far, but I mean the word only is being used as only and therefore seems to me to create open season on someone who has any other. They're obese or they have a cardiac condition or they've been using drugs. It's open season to kill them. Is that what the word only is to infer? And if not, what is your definition of it? I don't think so, but I do think that directly and only means directly and only. And let me say that first of a couple points. First of all, I totally disagree with appellants, and not surprisingly with appellants' interpretation of the decision in Harper v. Harris County. As I read it, that case only says, we no longer require a significant injury. No, I know that. I'm trying to hone in on the word only. So most people have some kind of condition. Yes. Maybe they're fat or maybe they have a heart condition or whatever like that. And so that makes them maybe more susceptible to something or other. Are those people then not able to bring an excessive force claim when they're hogtied and asphyxiated by deputies? Is that what the word only means in these cases? See, I don't know about these cases, but this is my thought in this particular case. In this particular case, assistant medical examiner, Dr. Darshan Phadak, ruled both the cause and the manner of death as undetermined. And in the text, and this is in the record, in the text in the autopsy report and the amended autopsy report, he says the cause is undetermined. As you all know, I know that you're aware there are five manners of death. And undetermined is one of them. And what Dr. Phadak says is, I am unable to separate out the pathophysiological effect of the cocaine and ethanol, plus cocaethylene, which you'll see in the autopsy report, from the possible effects of the asphyxiation because Dr. Phadak assumed that there was a hogtie. Okay, but their doctor says, but for. Yes. So even with the cocaine, even with being obese, even with generally being an unhealthy guy, he wouldn't have died that day but for the hogtie and asphyxiation. Why isn't that good enough? Because that's good enough causation for most everything else. Why isn't that good enough here? I don't think that's good enough because it doesn't state a constitutional violation under Gutierrez, which I'd like to... That's a different question. I'm looking at causation. So please, address that. Let's assume for the moment that they used excessive force unconstitutionally. Do you win on causation? And if so, explain to me, again, giving the fact issue with their expert because summary judgment, how do you win on causation? See, I think we win on causation because Dr. Grossberg, who, by the way, is not an assistant medical examiner. She is a forensic pathologist but she is not an assistant medical examiner as we sit here today. I think we win because Dr. Grossberg says the cause of death was multifactorial and multifactorial does not say to me directly and only, and multifactorial does not take into account the fact that Mr. Pratt had drugs and alcohol in his system and no fault of the deputies, you know? It just doesn't take that into account. Okay, but does Dr. Grossberg not say but for? In other words, yes, I understand there's a panoply of things that lead to death sometimes, but isn't this a... And you can have more than one but for cause of an event. Well, in this case, the official records of Harris County show undetermined. Okay, but this is summary judgment. Yes. Fact question, if an expert... Are you saying Dr. Grossberg's not an expert? No, I'm not saying that, no. If an expert comes in and contradicts the official records of Harris County, isn't that a fact question unless you can show me it doesn't matter that even accepting Dr. Grossberg is true, you win. That's the only way you win on summary judgment. See, I hate to be going around in circles, but the court concluded, the court below concluded that assuming the facts favorably to Mrs. Pratt, that directly and only meant directly and only in this circumstance. Judge Gilmour didn't say it means it in all circumstances. It means it with an asthmatic. It means it with someone who's obese. She said directly and only means directly and only. And so, therefore, I still think we win. And do you have a case? I do not have a case. You were telling us earlier about what you think directly and only, what its roots are, and how it came to be this, and whether it is contradictory of our previous precedents. Now, what were you going to say about that? Yes, Your Honor, I do not believe that it is contradictory of Harper v. Harris County because in Harper v. Harris County, as I read it, what this court was dealing with was the Supreme Court's decision in Hudson v. McMillian, which, of course, was an Eighth Amendment case. And in Harper v. Harris County, this court said, we will no longer require a significant injury as we originally required for a Fourth Amendment violation. In other words, in Harper v. Harris County, this court said, we are applying Hudson v. McMillian to the Fourth Amendment, and we are saying that a significant injury is no longer required. To me, it doesn't change directly and only in any way. Well, the point is, where does directly and only come from? We are told that the prior law, before directly and only became inserted into the precedent, it must show a substantial injury. What is the difference between substantial and directly and only? There would seem to be a lot. I believe that it goes back to Judge Haynes' questioning about the causation. Directly and only, to me, talks about the causation. And there is no doubt that Mr. Pratt experienced an injury in this case. But the directly and only applies to the causation and has been used in case after case after case. The application of that is troublesome because, I mean, if the police, for instance, he suffers an injury as a result of excessive force, and 10% of his injury is attributable to other factors and 90% to excessive force, then to say that there is no liability for the conduct of the police seems quite troublesome. I can understand. So how do you respond to that? Well, I would just respond to that by saying, but the law does say directly and only. And I would respond to that by saying, in this case, the force was reasonable. Okay, but you don't want to answer the question because you cannot point us to a case where only was used to exclude a clearly injured person, clearly injured by excessive force, but who had some other condition that also, like somebody who has osteoporosis and whose hand is broken by an officer, isn't able to recover or something like that. You don't have any case where only is applied to limit recovery. Is that a fair point? That's correct. Yes, that's absolutely correct. Okay, so I would like to address two main issues, unless y'all have any questions. I know you'll interrupt me. I'm good at this. I know, I know. It's good. It's very good. As the court is well aware, Gutierrez has been substantially limited by this court. First of all, Gutierrez itself, a 1998 case, has four factors, drug use, positional asphyxia, cocaine psychosis, and hog tying. And Gutierrez was really based in great part, as is expressed in that opinion, on the work of Dr. Donald Ray, who was a medical examiner in Seattle. And Dr. Ray came up with a San Diego study on sudden death due to positional asphyxia. Dr. Ray's work has been discredited on that aspect, you know, without saying anything negative about him. His work has been discredited to the point where in Price v. City of San Diego, Dr. Ray himself admitted. Very nice. I mean, you said, without saying anything about this, man, he's been totally discredited. I'm just saying, even he admitted it was... Well, that's because, you know, I know he only intended to do well, but Dr. Newman, who is an expert for the appellees in this case, performed certain additional studies, which this court has taken note of, specifically in Hill v. Carroll County, and noted that Dr. Ray's studies have been substantially, well, to some degree discredited to the point, as I said, where Dr. Ray himself has testified that hog tying is physiologically neutral. And, again, that's in Price v. City of San Diego. But coupled with getting on his back so he can't move his limbs and two people or at least one person's on his back pressing down on him while he's on his stomach, does that not add a degree of problem here? See, in this case, there is no evidence of the amount of weight on the back. The evidence is that Deputy Salazar was positioned with his knee over the scapula. Well, I mean, still, it's unreasonable. Hog tying is unreasonable. Because it violates the city policy. And any conduct the police engage in that is contrary to their instructions is unreasonable conduct. See, I don't... I apologize, Your Honour. I don't agree with that, because just because... I have to apologize. Okay, just because the county, you know, does not tolerate hog tying does not mean it's unconstitutional. I didn't say unconstitutional. I said it's unreasonable. It's unreasonable conduct. I mean, that's... So, whatever that means... I don't even think it's unreasonable unless we have all of the factors that are enunciated here in Gutierrez. And here, the first time that we see any of the deputies acknowledging that there may be drug involvement is when Deputy Goldstein discovered Brillo pads in Mr. Pratt's car. And those apparently have some sort of use, you know, with relationship to drugs. Okay, so I have 46 seconds left. So I want to say about Nagel that the Nagel case that Appellant's Counsel referred to involved the Harris County Constable's Office, not the Harris County Sheriff's Office. The evidence was that the Harris County Constable Precinct 1 was the policymaker for the execution of mental health warrants. The evidence was that the Harris County Precinct 1 Constable's Office had a practice and permitted hog tying. So that is very distinguishable. It's a totally separate policymaker from the policymaker that we find in the Harris County Sheriff's Office in this case. I mean, I think our authorities said hog tying per se is not unconstitutional. That's correct, Your Honor. Whenever it is performed on someone who is known to have ingested drugs, it can be. Yes, Your Honor, I agree with that. I agree with that. Thank you very much. Yes, thank you, ma'am. And now we'll hear from Ms. Hutchison, who will... One of the last things that counsel said was that the county does not tolerate hog tying. And yet, in this case, the county did absolutely nothing in response to evidence that the hog tying occurred. Didn't take any action against deputies. Didn't take any action to provide additional training. Didn't do anything at all with respect to the fact that there was direct evidence that their policies were violated and that the deputies engaged in hog tying. With respect to the Gutierrez case, counsel listed the four elements of that. Drug use, positional asphyxia, cocaine psychosis, and hog tying, each of which exists in this case. And while the deputies, all of them said they suspected drug use and they described his behavior not as, you know, drunken or anything like that, but as bizarre. And that's...the word bizarre was used directly by the deputies in the record at 3451 and 3453 where they described his behavior as bizarre. He was disrobing, incoherent, not following commands, acting in a manner that you would not usually encounter unless somebody was under the influence of drugs. And with respect to the court's questions on the crisis intervention training, the deputies did all receive crisis intervention training from the state, the state-mandated TCLOS training. But that training actually says if you encounter someone who's acting in that manner, and they all acknowledge this in the record, that it's counterintuitive. They call it the control paradox, that where you...things you normally use to control someone have the opposite effect on someone who's under the influence. So if I point a gun at you and you're a rational person, you're going to stop what you're doing. If I point a gun at you and you're under the influence, it's going to escalate the situation. And the first thing the deputies did was pull out their tasers, yell commands, surround him and yell at him to stop. So Deputy Gutierrez may have been saying, you know, hey, dude, what's up? But he showed up after the other deputies had already surrounded him, yelled at him, and I believe had already... Deputy Lopez had already at least deployed his taser. But if they are getting the state-mandated training and then don't follow it, doesn't that... That may make a case for individual liability or heighten it, but doesn't that obviate the Monell liability? Because isn't it sort of like Thompson v. Connick where they said, you know, we can trust lawyers to go and learn about Brady in law school and therefore we couldn't have anticipated what happened to Mr. Thompson. And I do agree with that with respect just to the CIT training, that they did get that training. The fact that they followed it doesn't create Monell liability. I do agree in that regard. But I do believe there are still Monell claims with respect to the failure to train on how to take him down as well as ratification. I think this is a perfect case for ratification. Okay, and then what would you do... So we've had a lot of discussion about ONLY. It's there in the case law kind of hanging out there. So you're writing the opinion. How would you address those cases? We're bound by prior precedent. What would you say about that? I would say what Your Honor said a little bit earlier is that it has been dicta in those cases because it has never been applied in a manner that is going to limit recovery because there was another factor involved that I can find anywhere in any Supreme Court case or Fifth Circuit case. And so I think that the cause in fact that has been used in the pattern jury charges and other Fifth Circuit cases, that it's a substantial factor sort of cause, is the most appropriate and makes the most sense under these circumstances. Because otherwise... I just don't know how it would apply in an excessive force case where there is generally going to be other factors involved. Okay, thank you very much. Thank you. We appreciate the presentation of that case. We think we know a little more about it than we might have otherwise known. And we will stand in recess until about...